UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 11-10195-RWZ

UNITED STATES OF AMERICA

v.

RONALD MARTINEZ

MEMORANDUM OF DECISION

January 2, 2013

ZOBEL, D.J.

The government's superseding indictment in this case names fifteen defendants in eleven counts. The charges stem from an extended investigation into an alleged criminal conspiracy to distribute large amounts of illegal drugs. Defendant Ronald Martinez is not named in Count 1 of the superseding indictment, which charges eight other defendants with the overarching conspiracy to distribute oxycodone, cocaine, and over one thousand kilograms of marijuana. Instead, defendant Martinez (hereinafter simply "defendant") is charged in Counts 2, 3, 10, and 11. Counts 2 and 3 are for conspiracy to collect debt by extortionate means, while Counts 10 and 11 are for possession of crack cocaine with intent to distribute.

Defendant has filed three motions: (1) to dismiss Counts 2 and 3 of the indictment, or in the alternative to require a bill of particulars; (2) to sever his trial from that of his codefendants; and (3) to suppress certain evidence due to the loss or

destruction of allegedly exculpatory video footage. I consider each motion in turn.

I.      **Motion to Dismiss**

Defendant moves to dismiss Counts 2 and 3 of the indictment on the ground that they violate his Fifth and Sixth Amendment rights by failing to state the offending conduct with enough specificity. In the alternative, he seeks a bill of particulars.

The Fifth Amendment "assures the defendant that the government will try him on the charges that the grand jury voted," rather than other offenses. United States v. Santa-Manzano, 842 F.2d 1, 2 (1st Cir. 1988). Similarly, the Sixth Amendment requires the government to tell the defendant the nature and cause of the charges against him. Id.  An indictment therefore must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).

The First Circuit's leading case in this area is United States v. Tomasetta, 429 F.2d 978 (1st Cir. 1970). In Tomasetta, the defendant was charged with collecting extensions of credit by extortionate means. The indictment alleged that the offense took place "on or about June 10, 1969, at Worcester, in the District of Massachusetts." Id. at 979 n.1. However, it did not name the victim, give a precise location, or describe the extortionate means. The First Circuit found the indictment deficient. It noted that the need for detail in an indictment "necessarily varies with the nature of the offense and the peculiarities of defending against the kind of charge involved." Id. at 979. It stressed that no one factor was determinative, but found that in the case before it the

failure to name either the victim, the extortionate means, or the precise location was fatal. Id. at 980-81.

The First Circuit has distinguished Tomasetta in several subsequent cases, including United States v. Sedlak, 720 F.2d 715 (1st Cir. 1983). The indictment in Sedlak charged the defendants with conspiracy to collect an extension of credit by extortionate means. Regarding that indictment, the court noted:

> The victim, Bill White, was named, thus presenting a major distinction from the Tomasetta case. The essential elements of the offense were alleged, a fact which defendants . . . do not dispute. The persons alleged to have been involved in the conspiracy were named, and the general time frame of the occurrence of the conspiracy was identified.

Id. at 719. The court found the indictment constitutionally adequate given those details.

The First Circuit again distinguished Tomasetta in United States v. Hallock, 941 F.2d 36 (1st Cir. 1991). In Hallock, the defendant was charged with conspiracy to possess and distribute drugs. The court emphasized the difference between conspiracy charges and substantive offenses, noting that "a conspiracy does not normally occur at only one particular time or place; it often takes shape and is carried out over a period of time, frequently in various locales." Id. at 40. Therefore, it determined, an indictment for conspiracy could not be expected to state specific times and places with the same detail as an indictment for a substantive offense. The Hallock court found the indictment before it sufficient because "[b]y informing Hallock that he was accused of a conspiracy in 1988, in Maine, to distribute cocaine and by listing the names of the four principal coconspirators, the indictment gave Hallock significant information as to the conduct out of which the indictment arose." Id.

3

Sedlak and Hallock resolve defendant's motion. Counts 2 and 3 of the superseding indictment charge defendant with two separate conspiracies to collect debt by extortionate means. Each count names defendant's alleged coconspirators, and identifies the alleged victims by their initials.[1] Each count specifies the general time frame of the conspiracy, as well as several places in which the conspiracy allegedly occurred. Although the time frames and places alleged are broad, they are not substantially broader than the indictment in Hallock, which charged a conspiracy "[i]n or about 1988, in the District of Maine and elsewhere." Hallock, 941 F.2d at 38 (alteration in original). Finally, the indictment states all the elements of the offense. It thus provides all of the information found constitutionally sufficient for the conspiracy charges pressed in Sedlak and Hallock. Defendant gives no persuasive ground for distinguishing those cases from his own. As such, his motion to dismiss the indictment is denied.

Defendant's motion in the alternative for a bill of particulars is also denied. A bill of particulars is meant to provide the defendant with details of the charges he faces "where necessary to enable him to prepare his defense, to avoid surprise at trial, and to protect against double jeopardy." United States v. Paiva, 892 F.2d 148, 154 (1st Cir. 1989). Here, defendant has already received substantial discovery, and has conducted several evidentiary hearings on suppression motions related to the conspiracies charged in Counts 2 and 3. Defendant has provided no plausible reason for thinking

---

[1] Defendant does not argue that the use of initials affects the indictment's sufficiency in this case, nor would that argument succeed.

that he will be unable to prepare his defense, will face surprise at trial, or will be exposed to double jeopardy. A bill of particulars therefore is not required.

## II.     Motion to Sever

Defendant also moves to sever his trial from that of his codefendants, on the grounds that he has been misjoined and that a joint trial would prejudice him. See Fed. R. Crim. P. 8, 14.

### A.     Misjoinder

A single indictment may charge a defendant with multiple offenses that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). In addition, the same indictment may charge multiple defendants if they allegedly "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). These rules "may be generously construed in favor of joinder," given that "consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants." United States v. Josleyn, 99 F.3d 1182, 1188 (1st Cir. 1996).

Here, it is clear that the charges in Counts 2 and 3 were properly joined with the rest of the indictment. Defendant may not have been charged himself in the drug distribution conspiracy of Count 1, but all of his coconspirators in Counts 2 and 3 were. More importantly, the conspiracy charged in Count 1 gave rise to the debts that Counts 2 and 3 say defendant used extortionate means to collect. Given those facts, Counts 2

and 3 are part of the "same series of acts or transactions" as Count 1. See Fed. R. Crim. P. 8(b). Counts 2 and 3 are likewise properly joined with Counts 4-9, all of which allege other offenses in the same series of acts driven by the drug distribution conspiracy of Count 1. Cf. United States v. Houle, 237 F.3d 71, 74-75 (1st Cir. 2001) (joinder proper where all counts bound together by alleged racketeering conspiracy, even if defendant was not charged in the racketeering count).

     Counts 10 and 11, charging defendant with possession of cocaine with intent to distribute, are also properly joined with the rest of the indictment. Count 10 is based on cocaine that defendant allegedly possessed when arrested shortly after leaving a meeting with his coconspirators. Count 11 is based on cocaine that defendant allegedly possessed when arrested after trying to break into a residence as part of the extortion charged in Count 3. Both Counts 10 and 11 charge possession of cocaine within the timeframe of the conspiracy charged in Count 3. Furthermore, the government claims defendant's possession of cocaine was linked to the extortion conspiracy charged in Count 3: specifically, the government states that the defendant conspired to intimidate the debtor by planting cocaine in his residence and then informing the police. Given these facts, the charges in Counts 10 and 11 are sufficiently related to the other charges in the indictment to warrant joinder under Rule 8. That conclusion is particularly strengthened by considerations of judicial efficiency here, which weigh against having a second trial that would duplicate substantial evidence from the first. See Joselyn, 99 F.3d at 1188.

    **B.**    **Severance**

Defendant argues, however, that even if the charges are properly joined under Rule 8, they should nevertheless be severed under Rule 14 to prevent prejudice. See Fed. R. Crim. P. 14. Of course, the usual rule is that "defendants charged in the same indictment should be tried together." Houle, 237 F.3d at 76; see also Zafiro v. United States, 506 U.S. 534, 537 (1993). A defendant can only succeed in a motion for severance under Rule 14 if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. Here, defendant notes the possibility that the jury might confuse the conspiracies to extort, with which he is charged, with the other conspiracies in the indictment (to distribute drugs, to launder money, and to defraud the government), with which he is not. Defendant also points out the risk that the jury might confuse the cocaine charges against him with the much larger drug distribution conspiracy.

There is admittedly some risk of prejudice to defendant from joinder, given that this is a complex case and his culpability is arguably less than his codefendants'. See Zafiro, 506 U.S. at 534. Such a risk is "ever-present" in joint trials. United States v. DeLeon, 187 F.3d 60, 64 (1999). But under the circumstances, the risk is not sufficiently serious to justify two separate trials. The charges against defendant are distinct enough from the unrelated charges that the risk of confusion is low. And appropriate limiting instructions should be sufficient to ensure that the jurors in this case consider the evidence and the charges separately as to each defendant before them. See Houle, 237 F.3d at 76. For these reasons, defendant's motion to sever is

denied.

## III. Motion to Suppress

The extortion conspiracy charged in Count 2 allegedly involved firing several shots into a jewelry store near Waltham, Massachusetts, in order to intimidate the owner. The extortion conspiracy in Count 3, on the other hand, involved an attempted break-in at 14 Carlton Terrace in Watertown, Massachusetts. Defendant moves to suppress evidence of his participation in each conspiracy based on the government's failure to preserve video footage of the two incidents. After holding an evidentiary hearing and considering the evidence submitted by defendant and the government, I find the following facts and deny defendant's motion.

### A.    The Jewelry Store Shooting

On March 7, 2011, a large, heavy-set black man went to Cristofori Jewelers around noon and asked the owner, Mark Cristofori, if he was "Mike" or "Mark." The owner, who found his visitor very suspicious, replied that he was not. The man then said, "Are you sure?" and when the owner confirmed his answer, left the store.

About four hours later, a different man stood outside the store and fired several shots into the glass front door. The bullets did not seriously harm anyone inside the store, although one woman inside suffered minor injuries from the broken glass. A store employee immediately called 911, and officers from the Newton Police Department arrived on the scene shortly thereafter. Those Newton officers were not involved with the drug-trafficking investigation that led to the present indictment; at the time, the government did not realize the shooting was related.

Newton officers at the jewelry store reviewed the video footage captured by the store's security system. Aided by a technician from the security company, they copied a video clip from an outside camera showing the shooter firing into the store, as well as a video clip from an inside camera showing the shots. Based on information from the store owner, they also copied a video clip from the outside camera of the heavyset man entering the store at noon.[2] The Newton officers did not, however, copy a full video clip from the inside camera of the heavyset man inside the store; instead, they copied only a still image from the inside camera showing the heavyset man talking to the store owner. Both the video clips and the still image are grainy, and it is fairly difficult to make out visual details.

The police retained the copied video clips and still image, but the jewelry store later recorded over the original security camera footage in its system. As a result, the full video of the heavyset man inside the store is no longer available.

The government now contends that the heavyset man was defendant, and that his visit to the store was related to the subsequent shooting. Defendant moves to suppress the still image, and any subsequent identification of defendant from that image, based on the government's failure to preserve the full video clip showing the heavyset man inside the jewelry store.

**B. The Attempted Break-In**

As part of the government's investigation in this case, it installed a video camera (a "pole cam") on a telephone pole outside of 14 Carlton Terrace. That camera

---

[2] That video clip does not show the heavyset man's face.

continuously transmitted a live video feed to a television monitor at the agents' surveillance base. However, that live transmission was not continuously recorded by any data storage system. Instead, the camera only recorded images to its storage system when its motion sensor was triggered.  However, the motion sensor suffered from sporadic malfunctions and tended to perform poorly in low light. As a result, the camera occasionally failed to record certain footage even when agents observed motion on the live video feed.

On the night of April 10, 2011, agent Michael Krol was watching the live video feed and saw two men on the rooftop of 14 Carlton Terrace, apparently trying to break in. Krol anonymously called the Watertown Police Department to report the attempted break-in. Defendant was subsequently observed by the Watertown police in the rear yard of 14 Carlton Terrace and was arrested.

No video footage from the surveillance camera is available for that night. Krol testified at the evidentiary hearing that the camera's motion sensor apparently malfunctioned, so the video transmission he was watching was never recorded to the data storage system.[3]

Based on the government's failure to preserve the video transmission from that night, defendant moves for suppression of any testimony regarding the observation of the men on the rooftop at 14 Carlton Terrace.

**C.  Analysis**

---

[3] At a previous evidentiary hearing, Krol testified that the video footage from that night might have been recorded but was not available. He testified at this hearing that he spoke with a fellow agent after the last hearing and learned the footage was never recorded.

Due process protects a defendant's access to exculpatory evidence in the hands of the government. California v. Trombetta, 467 U.S. 479, 485 (1984). It forbids the government from destroying evidence whose exculpatory value is apparent. Id. at 489. Furthermore, it forbids the government from destroying even potentially exculpatory evidence, if the defendant can show the government acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); Illinois v. Fisher, 540 U.S. 544 (2004). The defendant bears the burden of showing that the evidence was apparently exculpatory or potentially exculpatory, and (if necessary) that the government acted in bad faith. United States v. Ossai, 485 F.3d 25, 28, 30 (1st Cir. 2007); Youngblood, 488 U.S. at 58.

Defendant argues that the exculpatory value of the video footage was apparent for each incident. With respect to the lost video clip from the jewelry store, defendant argues that he could have performed further analysis of the full clip to show that he was not the heavyset man in the image. Defendant presented a video forensics expert at the evidentiary hearing who testified that the still image was of lower quality than the lost video clip. He also testified that he could have overlaid defendant's image onto the heavyset man pictured in the original video, to compare their physical features, but was unable to do that comparison with the still image. Defendant speculates that if he had the video, he could select other still images or do other analysis to show he had been misidentified. Likewise, with respect to the video transmission of the break-in, defendant argues that the transmission would have shown that he was never on the roof of 14 Carlton Terrace and never intended to break into the house.

11

But defendant's speculation about what the videos might have shown, or what further analysis might have revealed, is not enough to show that the videos were <u>apparently</u> exculpatory. That standard requires that the evidence's exculpatory value be apparent—that is, obvious—"before the evidence was destroyed." <u>Trombetta</u>, 467 U.S. at 489; <u>see</u> <u>Youngblood</u>, 488 U.S. at 56 n.*. Thus, for instance, a witness's written statement corroborating the defendant's alibi is apparently exculpatory. <u>Olszewski v. Spencer</u>, 466 F.3d 47, 54-57 (1st Cir. 2006). But where "no more can be said than that [the missing evidence] could have been subjected to tests, the results of which might have exonerated the defendant," then the missing evidence is only potentially exculpatory. <u>Youngblood</u>, 488 U.S. at 57. Here, defendant argues that the missing videos would have shown he was not the man in the jewelry store and was never on the roof of 14 Carlton Terrace. The government, on the other hand, argues that the videos would only have corroborated the other evidence and inculpated defendant further. Faced with this dispute, I find defendant has not shown the missing videos were obviously exculpatory at the time the government failed to preserve them. Instead, here as in <u>Youngblood</u>, "this evidence was simply an avenue of investigation that might have led in any number of directions." <u>Id.</u> at 56 n.*.

Nevertheless, the missing videos are of course <u>potentially</u> exculpatory. As such, defendant can show a due process violation if he can prove that the government acted in bad faith. <u>Illinois v. Fisher</u>, 540 U.S. 544, 547-48 (2004); <u>Youngblood</u>, 488 U.S. at 58. Defendant argues that bad faith should be inferred because the videos were not preserved during an ongoing investigation, the defendant never had a chance to review

12

the videos before they were lost, and (with respect to the jewelry store video) because the still image the police copied is of lower quality than the original. But the evidence presented casts no suspicion on the government's motives in failing to preserve the evidence. Cf. United States v. Laurent, 607 F.3d 895, 900 (1st Cir. 2010) (no showing of bad faith based on routine erasure without suspicious circumstances). The Newton officers testified that they were primarily interested in capturing the video clips of the shooting at the jewelry store, and did not realize until later that they had only a still image of the heavyset man inside the store and not a full video clip. Given that the officers were responding shortly after the shooting took place, and had no prior knowledge that the shooting might be related to defendant or this case, their testimony is credible. Likewise, Krol testified that the motion sensor on the camera outside 14 Carlton Terrace sporadically malfunctioned, particularly in low light; no evidence contradicts his testimony that the camera simply failed to record that night. The government's failure to preserve these videos may have been "short-sighted and even negligent," but that is not enough to show bad faith. United States v. Garza, 435 F.3d 73, 75 (1st Cir. 2006). Absent any showing of an improper motivation, defendant has not established a due process violation. Therefore, the motion to suppress is denied.

## IV.   Conclusion

Defendant's motions to dismiss (Docket # 295), to sever (Docket # 334), and to suppress (Docket # 317) are DENIED.

|  |  |
|---|---|
| January 2, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |

UNITED STATES DISTRICT JUDGE