UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 11-10195-RWZ

UNITED STATES OF AMERICA

v.

RONALD MARTINEZ

MEMORANDUM OF DECISION

June 3, 2013

ZOBEL, D.J.

Defendant Ronald Martinez has been charged in a superseding indictment with two counts of conspiracy to collect debt by extortionate means and two counts of possession of cocaine base with intent to distribute. He now moves to suppress all evidence obtained as the result of an allegedly illegal traffic stop on February 12, 2011. Based on the evidence presented, I find the following facts and deny defendant's motion.

I.  **Findings of Fact**

Around June 2010, federal law enforcement agencies began investigating an alleged drug trafficking conspiracy involving a suspect named Safwan Madarati. Based on extensive wiretapping of Madarati's telephone conversations, the government also identified Vartan Soukiasian and Hagop "Jack" Sarkissian as two other suspected co-conspirators. By early 2011, the investigation had developed substantial evidence implicating Madarati and his co-conspirators in large-scale drug distribution. Federal

investigators had also observed Madarati and Soukiasian meeting on several occasions at Newton Automotive, an automobile repair shop owned and operated by Sarkissian.

On the afternoon of February 12, 2011, government agents kept Madarati under surveillance and observed the following movements. First, Madarati left Newton Automotive around 12:53pm and drove in his blue Dodge pickup truck to After Hours Towing, a business operated by Soukiasian. An hour later, Madarati briefly returned home. He then left his home, now driving a red Chevrolet van, and went to the the Arsenal Mall in Watertown; there, he apparently made a purchase at the T-Mobile cellular phone kiosk. Madarati briefly returned home again, dropped off the red van, and drove around for about fifteen minutes in his blue pickup speaking on the phone before returning home once more. Madarati next went back to After Hours Towing in his blue pickup, and then again to the T-Mobile kiosk in the Arsenal Mall where he apparently made another purchase. He parked and left his pickup for about half an hour on Melendy Avenue in Watertown, after which he returned to his pickup and drove it to a McDonald's on Soldiers Field Road in Boston. He arrived at the McDonald's around 5:54pm. Meanwhile, as Madarati was visiting and revisiting these various locations, the government intercepted two telephone calls by Madarati to a suspected co-conspirator about collecting certain debts. The government alleges those debts were drug-related.

At the McDonald's, Madarati parked beside a white Ford Edge and spoke briefly to its occupants. That white Ford Edge then followed Madarati's blue Dodge pickup as

Madarati left the McDonald's parking lot and drove to Newton Automotive. Both cars parked in the Newton Automotive lot around 6:03pm; the business appeared closed at that time, with all the doors closed and no lights on in any of the garages. Madarati got out of his truck, and two men got out of the white Ford Edge. All three men then walked together into Newton Automotive, where they remained for about fifty minutes, until 6:54pm. They then left the automobile repair shop; Madarati drove off in his pickup, while the two other men drove off in the white Ford Edge.

    Massachusetts State Police officer Brad Porter, a member of the surveillance team, followed the white Ford Edge as it left Newton Automotive. He and other members of the team continued to follow the Edge as it drove eastbound on the Massachusetts Turnpike and then exited onto Interstate 93 southbound. According to Porter's testimony at the hearing, as he watched the Edge exit onto Interstate 93 southbound, he observed that neither of the car's rear taillights were illuminated even though darkness had fallen.

    The federal investigators decided to stop the Edge in order to identify its occupants. To keep the surveilling agents under cover, they chose to have a different law enforcement officer stop the car. Porter therefore contacted Massachusetts State Police trooper Matthew Hannigan, who was in uniform and driving a marked police cruiser nearby, and asked Hannigan to stop the Edge. Porter also informed Hannigan that the Edge's rear taillights were not functioning properly.

    Hannigan arrived on the scene and pulled up behind the Edge. According to his testimony, he independently observed that the Edge's rear taillights were not

illuminated, although the brake lights appeared to be working. He then activated his emergency lights, and the Edge promptly pulled over. After another marked police cruiser arrived as backup, Hannigan approached the Edge and informed defendant, the driver, that he had been stopped because his taillights were out. Hannigan then requested defendant's license. Defendant provided his license; however, it had been suspended. Hannigan consequently arrested defendant for driving with a suspended license. After his arrest, defendant was taken back to the police barracks and searched, where some crack cocaine was found in his pocket.

Although defendant did not testify at the evidentiary hearing, he submitted an affidavit contesting the officers' assertion that the Edge's rear taillights were out. Defendant also submitted vehicle maintenance records from the car rental company that owned the Edge; these records apparently show that the Edge was never serviced for any taillight malfunction.[1]

## II. Analysis

It is well established in Fourth Amendment doctrine that law enforcement agents "may stop and briefly detain an individual for investigative purposes if [they] have a reasonable suspicion that criminal activity is afoot." United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013). Such suspicion cannot rest on a mere hunch; instead, the

---

[1] Defendant was not able to obtain the vehicle maintenance records before the evidentiary hearing was held on November 6, 2012. He therefore moved to keep the hearing open until he was able to obtain the records, which motion I allowed. See Docket # 335 (motion to keep open the record); Docket # 340 (clerk's notes recording that the motion was allowed); Docket # 443, at 133 (transcript of hearing held Nov. 6, 2012, where the motion was first made); Docket # 442, at 10 (transcript of hearing held Nov. 20, 2012, where the motion was allowed from the bench). Defendant did not file the records until May 24, 2013, at which point the motion became ripe for decision. See Docket # 459, Ex. 1.

government "must be able to point to specific and articulable facts" justifying the stop. Terry v. Ohio, 392 U.S. 1, 21 (1968). The existence of reasonable suspicion depends on the totality of the circumstances. Dapolito, 713 F.3d at 148.

The question presented here is simple: Did the investigating officers have reasonable suspicion justifying the initial stop of defendant's car? If so, then Hannigan could legitimately request defendant's license pursuant to that stop, see Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185-88 (2004); once he discovered the license was suspended, he had probable cause to arrest defendant for the crime of driving with a suspended license, see Mass. Gen. Laws ch. 90, § 23; Virginia v. Moore, 553 U.S. 164, 166-67, 171 (2008); and the police could then search defendant incident to his arrest, United States v. Robinson, 414 U.S. 218 (1973). But if there was no reasonable suspicion justifying the initial stop, then the evidence discovered after that stop must be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

Considering the totality of the circumstances, the investigating agents had sufficient reasonable suspicion to stop the white Ford Edge. As noted above, the federal investigation had already developed substantial evidence allegedly linking Madarati and others to a major drug trafficking conspiracy. They had also observed several meetings between Madarati and Soukiasian, a suspected co-conspirator, at Newton Automotive; that establishment was owned and operated by Sarkissian, another suspected co-conspirator. On the date of the stop, the investigating agents had already followed Madarati on a series of suspicious visits, including stops at both

Soukiasian's and Sarkissian's businesses. They had also recorded two telephone calls by Madarati that same day to another suspected co-conspirator, both regarding the collection of alleged drug debts. Madarati then met two unknown men in a white Ford Edge in a McDonald's parking lot, led them to Newton Automotive after business hours, and remained with them in the closed repair shop for some fifty minutes. These specific and articulable facts, under all the circumstances, were enough to justify a brief investigative stop of the Edge to identify the two unknown men and seek more information about their involvement in the alleged drug trafficking conspiracy.[2]

Defendant points out that the federal investigation had no previous information linking him to the alleged conspiracy, nor any precise information showing that conspiracy-related activity was occurring that evening at Newton Automotive. While information of that sort would weigh even more heavily in favor of reasonable suspicion, it is not required. The observations made by the investigating officers gave them specific reasons, well beyond a mere hunch, for suspecting that the Edge's occupants might be involved in the conspiracy under investigation.[3]

---

[2] Of course, Hannigan—the officer who actually made the stop—was not personally aware of all the information discovered up to that point by the federal investigation. But under the collective knowledge doctrine, the correct focus is upon the total information available to all of the officers involved in the investigation, not just the individual officer making the stop. See United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010). That doctrine is appropriate where, as here, the investigative team in possession of all the relevant information simply directs another officer to carry out the stop.

[3] I therefore need not decide whether the officers also had reasonable suspicion based on the Edge's allegedly malfunctioning taillights. The testimony by Porter and Hannigan that the taillights were malfunctioning is somewhat undercut by defendant's affidavit to the contrary, and by the fact that the vehicle maintenance records apparently show no repairs for faulty taillights. On the other hand, the vehicle maintenance records only show one state inspection and three repairs total, all occurring between January 23, 2012 and April 5, 2012 (about a year after the stop at issue). That leaves some doubt as to whether the records are complete. Even if they are, the taillight malfunction might have been only a temporary issue, or the taillights might have been working but turned off. In any case, the fact that the officers already had reasonable suspicion means that it is unnecessary to resolve this factual dispute.

## III. Conclusion

Defendant's motion to suppress (Docket ## 318, 324, and 459) is DENIED. His motion to supplement his affidavit (Docket # 320) is DENIED AS MOOT.

|  |  |
|---|---|
| June 3, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |