UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 11-10195-RWZ

UNITED STATES OF AMERICA

v.

RONALD MARTINEZ and KARAPET DZHANIKYAN

MEMORANDUM OF DECISION

December 30, 2013

ZOBEL, D.J.

Pursuant to Fed. R. Crim. P. 29 and 33, defendants Ronald Martinez and
Karapet Dzhanikyan move for a judgment of acquittal and for a new trial (Docket ##
540, 542, 543, and 544).[1]  For the following reasons, the motions are DENIED.

## I.  Background

Defendants were among a dozen co-defendants named in a superseding
indictment for various crimes in connection with illegal drug operations headed by one
Safwan Madarati.  A federal investigation revealed that Madarati and his associates
were involved in the large-scale distribution of marijuana and oxycodone, as well as
smaller quantities of cocaine.  Dzhanikyan was charged with one count of conspiracy to
distribute oxycodone (Count 1), in violation of 21 U.S.C. § 846, for his alleged role in
helping Madarati obtain oxycodone from California for sale in Massachusetts.  Martinez
was implicated in two counts of conspiracy to collect debt by extortionate means, in

---

[1] Though not labeled as such, the court assumes the motions are submitted in the alternative.

violation of 18 U.S.C. § 894(a)[2]: Count 2 charged a plan to threaten a jewelry store owner for failing to pay for a delivery of marijuana, and Count 3 alleged a scheme to intimidate an associate, Victor Loukas, suspected of stealing oxycodone from Madarati. Martinez was also charged with two counts of possession with intent to distribute cocaine base (Counts 9 and 10), in violation of 21 U.S.C. § 841(a)(1).

The evidence at defendants' nine-day jury trial included live testimony from various agents, law enforcement officials, co-defendants, and other witnesses; surveillance photographs; physical evidence; audio recordings of wiretapped telephone conversations; and transcripts of text messages.  On June 17, 2013, at the close of evidence, Martinez moved for a judgment of acquittal pursuant to Rule 29(a) on the basis of insufficient proof.  I allowed Martinez's motion as to Count 2 (conspiracy to collect debt through extortionate means from the jewelry store owner), but denied the motion as to all other counts

The jury found both defendants guilty on their respective remaining charges on June 19, 2013.  On July 3, 2013, Martinez renewed his motion for judgment of acquittal and moved for a new trial claiming deficient jury instructions (Docket ## 540 and 542). Dzhanikyan likewise moved for acquittal (Docket # 543) on July 3 on the basis of insufficient evidence and moved to join Martinez's new trial motion (Docket # 544) on July 4.[3]

---

[2] The actual text of 18 U.S.C. § 894 prohibits the collection of "extensions of credit" by extortionate means.  I use the term "debt" here to mirror the language used in the indictment.

[3] Dzhanikyan was sentenced on November 12, 2013.  See Docket # 625.  Martinez is currently awaiting sentencing.

2

## II.  Legal Standard

Under Rule 29, "[a] judgment of acquittal should only be granted when the evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense."  United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004). "Under this formulation, the court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict."  United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(2).  Motions for a new trial are directed to the discretion of the court, which "may weigh the evidence and evaluate the credibility of the witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict."  United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010) (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001).

## III.  Discussion

### A.  Dzhanikyan's Motion for Acquittal[4]

Dzhanikyan contends that there was insufficient evidence to show that he was a participant in the conspiracy to distribute oxycodone charged in Count 1 and that he

---

[4]On December 26, 2013, I denied by endorsement defendant's motion for judgment of acquittal. Following are the reasons for that ruling.

was the individual actually implicated in the government's investigation.[5]  These arguments lack merit.

In late 2010, following a large seizure of drug proceeds by law enforcement and subsequent disagreements with marijuana suppliers in Canada, Madarati turned his attention to obtaining oxycodone pills, which he called "blues," "blueberries," or "buttons."  The government alleged that Dzhanikyan connected him to a source of supply, an individual named Manuel Khandjian (also known as "Manos" or "Baldy") in California.  Phillip Lavoie, a federal case agent on the Madarati investigation, testified that on November 17, 2010, he overheard a wiretapped telephone conversation in which Dzhanikyan, Madarati, and Khandjian discussed placing an order for 10,000 pills, which Dzhanikyan would retrieve from Khandjian.   Another intercepted call on December 3, 2010, revealed that Dzhanikyan had traveled to Los Angeles and was with Khandjian.  During his trip, on December 6, Dzhanikyan received another call from Madarati, the audio recording of which was introduced into evidence; Madarati asked whether Dzhanikyan had signed "the paperwork" (a term Madarati often used when referring to drug money), and Dzhanikyan confirmed that he had.  Madarati expressed his approval and cautioned Dzhanikyan to "just be careful."  Madarati also spoke briefly on the same call with Khandjian, who was with Dzhanikyan at the time.  Two days later, Madarati sent a text message to Dzhanikyan's phone: "Im still wake just call me when you land so I know EVRY thing is ok pls [sic]."

---

[5] Dzhanikyan also claims a variance and evidentiary spillover.  Such allegations overlap with those made in defendants' motions for a new trial and will be addressed accordingly.

There were additional incriminating communications later that month. On December 29, 2010, Dzhanikyan and Madarati spoke on the telephone in another intercepted call. Dzhanikyan complained that Khandjian was calling him repeatedly and grousing about having to wait for something. Later that day, Dzhanikyan texted Madarati asking if he had "any blues left" and offering to pay $20 apiece for ten or fifteen of them. On January 15, 2011, Dzhanikyan sent another text message asking if Madarati wanted him to go see "Mano" (Khandjian) again: "ill go come back and give u everythin and u can give me just a few [sic] . . ." Two days after, Dzhanikyan texted once more, asking Madarati if he was "alset with Mano [sic]."

Such evidence was more than sufficient to support a finding that Dzhanikyan knowingly and voluntarily participated in the conspiracy to distribute oxycodone. Dzhanikyan's words and actions strongly suggest that he was aware of Madarati's narcotics operation, he agreed to assist Madarati in obtaining and transporting pills for distribution, and he actively and intentionally did so. See United States v. Hernandez, 218 F.3d 58, 65 (1st Cir. 2009) ("To establish that the defendants belonged to and participated in the drug conspiracy, the government must show two kinds of intent: 'intent to agree and intent to commit the substantive offense.'") (internal quotation and citation omitted).

Dzhanikyan's claim that the government lacked adequate identification evidence – "the[r]e was no evidence identifying the person seated at defense table next to counsel as the same person doing the actions the government said were il[l]egal and part of the drug conspiracy," Docket # 543 at 3 – is likewise unavailing. One of the

phone numbers over which calls and text messages were intercepted was subscribed under Dzhanikyan's name.  Agent Lavoie testified that he met Dzhanikyan after his arrest and was able to recognize Dzhanikyan's voice from the intercepted calls.  See United States v. Oreto, 37 F.3d 739, 752 (1st Cir. 1994) (rejecting argument that government failed to identify voices on wiretap recordings where law enforcement agents testified to their familiarity with the voices at issue and identified the speakers on the recordings).  Agent Lavoie subsequently identified Dzhanikyan in the courtroom before the jury.  There was nothing to suggest that this identification was unreliable or inaccurate, and the jury was entitled to credit it.   Dzhanikyan's motion for acquittal fails.

### B. Martinez's Motion for Acquittal

#### 1. Conspiracy to Collect Extension of Credit by Extortionate Means

Count 3, charging Martinez with an extortion conspiracy, stems from a business relationship gone awry.  In early 2011, Madarati enlisted the assistance of Victor Loukas in obtaining large quantities of oxycodone pills from Khandjian and transporting them from California to Massachusetts.  In January 2011, Loukas accompanied Madarati to Los Angeles to meet with Khandjian.  Madarati gave $100,000 cash to Khandjian in exchange for a duffel bag filled with 10,000 oxycodone pills.  Madarati and Loukas flew back to Boston with the pills in their checked luggage.

In February 2011, Madarati arranged for Loukas to make a solo trip to California to obtain more oxycodone pills.  Madarati gave Loukas $94,000 for the drug purchase and paid him $5,000 to cover his airfare, hotel stay, and expenses, with the remainder

for Loukas to keep as his "profit."  Loukas met with Khandjian in Los Angeles and, as

before, exchanged the $94,000 for 9,400 pills.  Uncomfortable with bringing the pills

with him on his flight back to Boston, Loukas elected to call a friend, "Nick," in San

Diego for help.  Loukas took a train to San Diego, where Nick packaged the pills and

mailed them to a retail shipping store in Boston under a false name.  Loukas, upon his

return to Massachusetts, picked up the package from the store and delivered the pills

to Madarati.

Madarati sent Loukas on a third trip to Los Angeles in March 2011.  Loukas

received $84,000 from Madarati to again purchase oxycodone from Khandjian, along

with $5,000 for his expenses and services.  This time, however, Loukas did not deliver

the oxycodone to Madarati but secretly turned them over to his friend Nick, who agreed

to sell the pills and split the proceeds with Loukas.  Unsurprisingly, Loukas did not

inform Madarati about this detour.  Instead, he called Madarati with a fabricated story

that he had been pulled over in California by the police and the pills had been seized.

About a day after his return to Boston, Loukas met with Madarati at Loukas'

home in Watertown and reiterated his false story.  Loukas thought Madarati believed

the tale until the two took a trip to a nearby convenience store.  There, Madarati noted

that he "hope[d] it wasn't [Loukas] because he would take care of the problem like he

did at the jewelry store."  Loukas understood that Madarati was referring to a recent

incident in which several gunshots had been fired at a jewelry store after its owner had

failed to pay for a marijuana shipment.[6]  Madarati made clear on several occasions

---

[6] The jewelry store shooting was part of the alleged extortion conspiracy charged in Count 2.

thereafter that he did not believe Loukas's police story and demanded that Loukas give him his money or the pills.

In early April 2011, agents intercepted several phone calls between Madarati and various associates, particularly Sanusie Mo Kabba, discussing what to do about Loukas. These conversations revealed that Madarati planned to forcibly collect the money or drugs from Loukas. Madarati made arrangements with Kabba to hire two men to break into Loukas's Watertown home to search for the missing money or pills and confront Loukas. The plan also included potentially framing Loukas by planting cocaine and a scale in the home and then alerting the police. One of the men enlisted for the job was defendant Martinez, who had previously been observed with Kabba on other occasions.

Wiretapped calls on April 9, 2011, suggested that the plan was in motion; Madarati and Kabba discussed Loukas's immediate whereabouts, and Madarati arranged for a $10,000 payment to two individuals. Believing Loukas was in imminent danger, agents found and warned him not to return home that evening. Shortly after midnight on April 10, an investigative agent observed, via a live surveillance camera installed outside Loukas's residence, two males walking back and forth on the driveway, climbing onto the roof of the garage, and trying to shake open a door. The agent alerted the local police of an attempted break-in. When officers arrived on the scene, they observed two figures near the house. While one suspect was able to flee, the other – Martinez – was apprehended and taken into custody. An empty gym bag was found in Loukas's backyard, and a search of Martinez's nearby rental vehicle

8

yielded, among other things, personal papers of Martinez, latex gloves, $5,000 cash, and thirty individually wrapped bags of crack cocaine.[7]  During booking, officers found a handwritten note in Martinez's pocket with information about Victor Loukas, including his name, telephone number, address, the names of several bars he was known to frequent, and the times he usually walked his dog.

Martinez advances two arguments for acquittal on Count 3.  First, he claims that the government did not show that there was an "extension of credit" as defined by the statute.  Second, he asserts that the government did not demonstrate that he knowingly participated in the alleged conspiracy.

Martinez was convicted under 18 U.S.C. § 894(a), which provides:

> (a) Whoever knowingly participates in any way, or conspires to do so, in the use of extortionate means
>
> > (1) to collect or attempt to collect any extension of credit or
> >
> > (2) to punish any person for the non repayment thereof,
>
> shall be fined not more that $10,000 or imprisoned not more than 20 years or both.

Section 891 defines extending credit as follows:

> To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and

---

[7] Police also encountered a third individual, Devon Simmons, inside the vehicle.  Simmons, then seventeen years old, had accepted a ride home that night from Martinez and front-seat passenger Shamon Ross, who is believed to be the other suspect seen by police.  Martinez stated that they needed to "do something" before dropping Simmons off at home.  The car made several stops, including at a pharmacy, where Simmons was asked to purchase latex gloves.  Martinez then drove to Watertown and stopped approximately one block north of Loukas's home.  Martinez and Ross got out of the vehicle and said they would be back soon; after Martinez's arrest, police officers found Simmons waiting in the back seat.

however arising, may or will be deferred.

18 U.S.C. § 891(1).  Martinez contends that the evidence is insufficient to sustain his

conviction on Count 3 because the government failed to prove that there was "an

extension of credit" from Madarati to Loukas.  He characterizes their relationship as

principal and agent rather than creditor and debtor; Loukas was working for Madarati

and given money to purchase oxycodone on Madarati's behalf, not borrowing money

for his own use.  Martinez asserts that there is no evidence that there was any

agreement between Madarati and Loukas that a loan had been provided or that

payment of any debt would be deferred.

The statute's definition of "extension of credit" is "very broad in its application

and is not confined to what is commonly known as a 'loan.'"  United States v. Sedlak,

720 F.2d 715, 720 (1st Cir. 1983).  See also United States v. DiPasquale, 740 F.2d

1282, 1288 (3d Cir. 1984), cert. denied, 469 U.S. 1228 (1985) ("The definition of an

extension of credit in section 891(1) was generously drafted.  The definition has been

even more generously construed.").  Courts have recognized "extensions of credit" in a

wide variety of situations and relationships, including deferred payments on gambling

debts, investments and joint ventures, embezzled funds, stolen goods, drugs, and even

invented or disputed debts.  See, e.g., United States v. Briola, 465 F.2d 1018, 1021

(10th Cir. 1972) (employee stole from bookmaker employer by placing fraudulent bets);

United States v. Natale, 764 F.2d 1042, 1045 (5th Cir. 1985) (defendant gave associate

money as part of joint venture and later demanded repayment); United States v.

Cassano, 132 F.3d 646, 650 (11th Cir. 1998) (accountant misappropriated investment

funds for personal use) and id. at 651-52 (associate stole money from defendants);

United States v. Bufalino, 576 F.2d 446, 452 (2d Cir. 1978) (victim obtained jewels from

defendant through deceit, without any intention of paying for them); United States v.

Annerino, 495 F.2d 1159, 1166 (7th Cir. 1974) (unauthorized use of credit cards and

misappropriation of partnership funds); United States v. Bonanno, 467 F.2d 14, 15-16

(9th Cir. 1972) (co-conspirator was given money up front to purchase drugs for partner,

but drugs were subsequently lost in transit); United States v. Cheiman, 578 F.2d 160

(6th Cir. 1978) (victim was forced to sign agreement to pay a false claim); Sedlak, 720

F.2d at 720 (victim did not believe he owed defendant any money).

Madarati's transaction with Loukas, while perhaps not a traditional "loan,"

nonetheless gave rise to a debt or claim.  Madarati gave Loukas $84,000 to purchase

oxycodone and paid him $5,000 for his services; Loukas understood that Madarati

expected him to either deliver the drugs or return the money.  Because Loukas did

neither, Madarati had a "claim" against him.  See Natale, 764 F.2d at 1045 (claim arose

because victim failed to repair automobiles in accordance with an earlier arrangement

with defendant); Cassano, 132 F.3d at 650 (defendants had a claim when they

suspected associate of embezzling their money).  Martinez, however, challenges

whether satisfaction of that claim was ever, by agreement, deferred.  He asserts that

Madarati never agreed to defer repayment by Loukas, and therefore credit was never

actually extended.

There is some disagreement among the circuits regarding the nature of the

"agreement" for deferral necessary to create an extension of credit.  In United States v.

Boulahanis, 677 F.2d 586, 590 (7th Cir. 1982), cert. denied, 459 U.S. 1016 (1982), the

Seventh Circuit drew a distinction between a mere debt and an extension of credit,

noting that Section 894 only criminalizes extortionate collection of the latter.  According

to the Boulahanis court, "the extension of credit is a deliberate act by a creditor" that

"does not occur merely because a customer defaults."  Id.  See also United States v.

Stokes, 944 F.2d 211 (5th Cir. 2011) (citing Boulahanis with approval and requiring, "at

a minimum, proof of conduct by the creditor manifesting assent to defer payment.").  In

contrast, the Third Circuit endorsed a decidedly broader interpretation of "extension of

credit" in DiPasquale, 740 F.2d at 1288.  Noting that Congress "explicitly intended [the

statute] to be wielded with 'vigor and imagination,'" that court declined to follow

Boulahanis as overly restrictive and instead concluded that "an agreement to defer the

repayment of a debt may be implied from the debt, even if the debt is wholly fictitious."

Id. at 1287-88.  In other words, "[w]hen a self-styled creditor appears before his 'debtor'

and demands satisfaction, the creditor posits both a debt *and the prior deferral* of its

repayment."  Id. at 1287 (emphasis added).

        The First Circuit in United States v. Hoyle, 237 F.3d 1, 6-7 (1st Cir. 2001), its

most recent opinion on the subject, acknowledged the split but declined to pick a side

in the debate, finding "sufficient indicia of agreement" in the circumstances of that case

to conclude that there had been an extension of credit.  There, an electrician named

Thomas Ferris had charged various customers exorbitant prices for his services.  When

several customers disputed the amounts owed and failed to pay in full, Ferris conspired

with defendant Brian Hoyle and others to employ extortionate means in order to get the

delinquent customers to pay.  On appeal, Hoyle argued that the money the customers

owed to Ferris for his electrical work was not an "extension of credit" under section 894

because Ferris neither made a loan to his customers nor agreed to defer payment for

his services.  The First Circuit, however, found that it was "logical to infer, at the very

least, that there was a tacit agreement to defer repayment of a debt":

> Once the services were provided and immediate payment was not
> demanded, an extension of credit was established.  It would be
> unreasonable for the victims to have assumed that the services were
> provided by Ferris at no costs.  It would also have been unreasonable for
> them not to have expected a bill in due course.  In fact, bills were later
> presented to the customers and eventually payment was demanded.

Id. at 6.

It is possible to view the facts of the current case in a similar vein, albeit with

services and payment rendered in reverse order.  Madarati paid Loukas in advance for

drug courier services from California to Massachusetts and provided funds to purchase

oxycodone, expecting the pills to be delivered to him when Loukas returned from Los

Angeles.  This arguably constituted an extension of credit since, mirroring Hoyle, it

would have been unreasonable for Loukas to assume that Madarati was paying him

(and providing resources) for services that would not be performed.  Alternatively, the

jury could have inferred a tacit agreement by Madarati to defer repayment based on the

timing of his demands and the extortionate scheme.  Shortly after returning to Boston in

March, Loukas met with Madarati, who indicated that he did not believe Loukas's

account of what allegedly happened to the pills.  Madarati thereafter demanded return

of the drugs or money on several occasions, but it was not until April 9 that Martinez

13

was sent to Loukas's home.  A jury could reasonably infer from the delay that Madarati was tacitly agreeing to postpone repayment by permitting Loukas additional time and opportunity to make amends.  See United States v. Bruce, 405 F.3d 145, 149-50 (3d Cir. 2005) (agreement to defer repayment of drug debt could be inferred where creditor waited two days before assaulting victim); Cassano, 132 F.3d at 648, 650 (creditor tacitly agreed to defer repayment by waiting to collect debt); Boulahanis, 677 F.2d at 590 (suggesting that if creditor had given debtor "additional time to pay, that would have been an agreement to defer payment of a debt, and such a deferral would be within the reach of Section 894.").  As such, there was sufficient evidence to support a finding that an extension of credit had been made.[8]

As for Martinez's knowing participation, the government presented ample evidence showing that he knew of Loukas's debt to Madarati; he was aware of the extortionate plan to punish Loukas; and he went to Loukas's home in furtherance of that plan.  See United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990) ("To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy.").  "[P]roof [of membership in a conspiracy] may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes." Id. at 853.

---

[8] Like the First Circuit in Hoyle, I find it unnecessary adopt the reasoning of DiPasquale in order to resolve this case.  Nevertheless, I note that Madarati's dealings with Loukas would easily qualify as an "extension of credit" under the Third Circuit's interpretation of the term.

Here, the government introduced recordings of multiple phone conversations between Madarati and Kabba discussing how to retrieve the missing drugs or money from Loukas and teach him a "lesson" for stealing.  Though Martinez himself was not heard on the calls nor mentioned by name by Madarati and Kabba, the details of their discussions corresponded closely to the timing of and events surrounding Martinez's arrest outside Loukas's house on April 9, 2011.  The items seized from Martinez's rental car and the note found in his pocket suggest Martinez had been duly informed about Loukas and had agreed to carry out Madarati and Kabba's plan.  The extortionate scheme also contemplated a potential confrontation between Martinez and Loukas – that Martinez might wait for Loukas to return home and "talk" –  which would make little sense unless Martinez had at least some knowledge of Loukas's debt and his failure to pay it.  Taken together, this evidence was sufficient for the jury to conclude not only that the conspiracy existed, but that Martinez was a knowing participant in its execution.

## 2.  Possession with Intent to Distribute Cocaine Base

Martinez challenges his conviction under Counts 10 and 11 for possession with intent to distribute cocaine base (crack cocaine), claiming that the government failed to produce sufficient evidence to establish an intent to distribute.

Relevant to Count 10, investigators conducted surveillance on Madarati on February 12, 2011, following him to various locations in Newton, Watertown, and Brighton throughout the day.  At some point, Madarati was seen driving into the parking lot of a fast food restaurant, where another vehicle, a white Ford Edge, began following

15

him.  The two vehicles drove together to Newton Automotive, a business owned by an associate of Madarati.  A little less than an hour later, Madarati and two other individuals left the shop, got into the cars, and drove off.  Officers followed the Ford Edge and conducted a traffic stop after observing that the vehicle's tail lights were not on.  Martinez was identified as the driver of the Edge and was eventually arrested for driving with a suspended license; Kabba was in the passenger seat.  During a search of Martinez's person, police found 3.25 grams of crack cocaine, in seven pieces, in his pocket.  Trooper Matthew Hannigan, the officer who conducted the search, testified that in his extensive experience with drug arrests, users of cocaine typically possess only one or two "rocks" of cocaine.  Trooper Hannigan also testified that the packaging of the cocaine, with each piece individually wrapped in a twist-tied knot, was consistent with distribution.

The basis for Count 11 is the thirty pieces of crack cocaine (weighing 12.52 grams total) found inside Martinez's rental car following his arrest outside Victor Loukas's home on April 10, 2011.  As with Count 10, the pieces were individually wrapped in separate baggies, consistent with officers' understanding of packaging for distribution.  The government also presented audio recordings of calls between Madarati and Kabba suggesting that Martinez was to plant crack cocaine in Loukas's house in order to frame him with the police.

"Possession-with-an-intent-to-distribute cases require prosecutors to prove that a defendant possessed the drugs for distribution rather than for personal use."  United States v. Polanco, 634 F.3d 39, 43 (1st Cir. 2012).  Martinez maintains that the

government's proof on both counts falls short in that respect.  Yet he acknowledges

that packaging drugs in smaller quantities may present sufficient evidence of intent to

distribute, and the First Circuit in United States v. Ayala-Garcia, 574 F.3d 5, 13 (1st Cir.

2009), found that "the packaging alone was strong circumstantial evidence that the

drugs were intended for distribution" where they had been subdivided into a number of

separate bags and plastic cylinders.  See also United States v. DesMarais, 938 F.2d

347, 352 (1st Cir. 1991) (beyond defendant's mere possession of marijuana and

hashish, "[a] reasonable inference of specific intent to distribute was further supported

by the evidence that the controlled substances had been re-packaged into small

packets.").  Moreover, there were other factors supporting an inference of intent to

distribute here, including the quantity of crack cocaine, at least in Count 11, see United

States v. Andrade, 94 F.3d 9, 13 (1st Cir. 1996) (noting that 14.21 grams is "not a small

amount of crack cocaine" and was consistent with distribution); Martinez's association

with Madarati and Kabba, known drug distributers; and the wiretapped conversations

about planting crack cocaine in Loukas's house, see United States v. Cortes-Caban,

691 F.3d 1, 18 (1st Cir. 2012) (the term "distribute" is defined broadly and includes the

act of taking drugs and intentionally planting them on other parties' persons or property

in order to give officers' cause for arrest).  There was sufficient evidence, therefore, to

support the jury's verdict against Martinez on Counts 10 and 11.[9]

---

[9] At trial, Martinez presented the testimony of Dr. Alan Wartenburg, a physician with expertise in
substance abuse issues, to counter Trooper Hannigan's assessment that the quantities and packaging of
crack cocaine found in Martinez's possession were consistent with distribution.  Dr. Wartenburg testified
that the packaging and use of drugs varied across dealers and users, and that some heavy users of
crack cocaine would binge on large amounts at a time.  However, when shown photographs of the thirty
baggies of crack cocaine seized from Martinez's rental car, Dr. Wartenburg opined that the pictured

### C.  Motions for a New Trial

Both defendants seek a new trial, claiming that the court's response to a question from the jury created a variance and resulted in prejudicial "evidentiary spillover."

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proved different facts than those alleged in the indictment."  United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2009).  A variance only warrants reversal if it affects a defendant's substantial rights, such as his right to "have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial."  United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992).  "The doctrine of variance also protects against prejudicial 'spillover,' so that in cases with multiple defendants proof that one defendant was involved in a conspiracy does not lead the jury to believe that another defendant was involved in a separate conspiracy."  Id.

Dzhanikyan and Martinez were charged in separate counts for separate conspiracies, and the government did not claim that defendants were part of the same conspiracy or had any direct connection to each other.  Nonetheless, while charged separately, the drug conspiracy in Count 1 (Dzhanikyan) and the extortion conspiracies in Counts 2 and 3 (Madarati) were not altogether unrelated.  All the conspiracies

---

drugs could be consistent with both personal use *and* distribution.
    Thus, while Dr. Wartenburg's testimony lent some support for the theory that Martinez possessed the crack cocaine for his own use, it was by no means conclusive nor inconsistent with the government's evidence that the drugs were intended for distribution.

stemmed from the drug operations of Safwan Madarati and his associates; the drug

conspiracy gave rise to the debts that the extortionate conspiracies were formed to

collect.  As previously addressed in denying Martinez's motion for severance (Docket #

364), the charges against defendants were properly joined in the indictment and tried

together.

Defendants insist, however, that their rights were jeopardized by an erroneous

jury instruction that allowed for prejudicial "spillover" between them.  During its

deliberations, the jury asked the court whether it could "use all the evidence presented

during the trial" as it evaluated "each individual charge."  After consulting with all

counsel, I answered "yes."[10]  Defendants now contend that the instruction was improper

and allowed for unfair "transference of guilt" from one defendant to the other.  United

States v. Dellosantos, 649 F.3d 109, 118 (1st Cir. 2011).  That is, Dzhanikyan claims

the court's instruction allowed the jury to use evidence of the extortion conspiracies

against him despite the fact that he was not implicated in Counts 2 and 3; Martinez

likewise claims he was prejudiced by evidence presented against Dzhanikyan in Count

1, for which he was not charged.  Thus, each defendant maintains that the instruction

forced him to defend against allegations regarding other counts without adequate

notice and exposed him to spillover evidence associated with his co-defendant.

There was no variance in the case.  The government's evidence aligned closely

---

[10] Dzhanikyan and the government raised no objection to this response.  Martinez objected out of concern that the jury would use information related to the extortion conspiracy charged in Count 2 (for which I had already allowed a motion for acquittal) as evidence of his involvement in the separate extortion conspiracy in Count 3.  There was no objection on the grounds that defendants raise here: that the instruction resulted in spillover prejudice between Madarati and Dzhanikyan.

with the conduct specified in the indictment and did not subject defendants to unfair

surprise.  Cf. Dellosantos, 649 F.3d 109 at 125 (the indictment charged a single

conspiracy, but the evidence at trial established the existence of two distinct

conspiracies; defendants were unfairly prejudiced by the difference because they were

"deprived of adequate notice of the charges against them, and they therefore limited in

their ability to prepare a defense at trial.").  While some of the government's proof with

respect to Dzhanikyan was not relevant to Martinez, and vice versa, such evidence

would not have been difficult to compartmentalize given the lack of overlap in the

charges against each defendant. The court's answer to the jury's question about using

all the evidence presented at trial came in the context of earlier instructions that clearly

delineated the counts and their required elements.  In my initial charge to the jury, I

explained that Dzhanikyan and Martinez had been charged with different crimes and

that the jury must consider the evidence separately as to each defendant and as to

each count.  I then proceeded to review the counts individually, noting each time which

defendant was implicated and instructing the jury to consider relevant evidence of that

defendant's conduct.  These measures adequately protected against the risk of

spillover prejudice.  United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991), cert.

denied, 502 U.S. 1079 (1992) .

## IV. Conclusion

Defendants' motions (Docket ## 540, 542, 543, and 544) are DENIED.

| December 30, 2013 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |